**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically at the time and date indicated, which may be materially different from its entry on the record.**



**Russ Kendig**
**United States Bankruptcy Judge**

**Dated: 04:43 PM October 17, 2014**

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| SII LIQUIDATION COMPANY, | ) | CASE NO. 10-60702 |
| | ) | |
| Debtors. | ) | ADV. NO. 14-6016 |
| _____ | ) | |
| JOHN B. PIDCOCK, AS | ) | JUDGE RUSS KENDIG |
| CREDITOR TRUSTEE, | ) | |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM OF OPINION** |
| v. | ) | **(NOT INTENDED FOR** |
| | ) | **PUBLICATION)** |
| LAURENCE V. GODDARD, et al., | ) | |
| | ) | |
| Defendants. | ) | |

      Defendants Laurence V. Goddard ("Goddard") and The Parkland Group, Inc. ("Parkland") filed a motion for judgment on the pleadings on June 16, 2014. Plaintiff filed its opposition to the motion on July 22, 2014. Defendants' reply came one month later, on August 22, 2014. On the same day, Defendant SS&G Parkland Consulting, LLC ("SS&G"),[1] also filed a motion for judgment on the pleadings, joining in the arguments presented by Goddard and Parkland. Plaintiff responded on September 8, 2014 and merely incorporated previous arguments. These motions are now before the court for decision.

---

1 "Defendants" will collectively refer to all three defendants.

1

The court's jurisdiction of this adversary is premised in 28 U.S.C. § 1334 and United States District Court for the Northern District of Ohio's general order of reference, Order 2012-7, dated April 4, 2012. Plaintiff alleges this is a core proceeding under 28 U.S.C. § 157(b)(2)(F), (H), and (O), which Defendants admit. To the extent allowed, Defendants consent to this court's jurisdiction and authority to make a final determination. Jurisdiction will be addressed further below. Venue is appropriate pursuant to 28 U.S.C. § 1409. This opinion represents the court's findings of fact and conclusions of law under Federal Rule of Bankruptcy Procedure 7052.

## FACTS

Debtors filed a chapter 11 petition on February 28, 2010. The debtors included Schwab Industries, Inc., Medina Cartage Co., Medina Supply Company, Quality Block & Supply, Inc., O.I.S. Tire, Inc., Twin Cities Concrete Company, Schwab Ready-Mix, Inc., Schwab Materials, Inc., and Eastern Cement Corp.[2] Schwab Industries, Inc. was the parent holding company and owned, directly or indirectly, all equity interests in the affiliated companies. Four related individuals held ownership shares in Schwab Industries, Inc.: David A. Schwab, Donna S. Schwab, Jerry A. Schwab, and Mary Lynn Schwab. The list of equity security holders filed at the onset of the case indicates that David Schwab owned just under twenty-eight percent (28%), Donna Schwab held approximately seven percent (7%), Jerry Schwab owned forty-five percent (45%), and Mary Lynn Schwab held approximately twenty-one percent (21%).

Plaintiff is trustee of the creditors' trust arising from confirmation of Debtors' liquidation plan on December 15, 2010. In this adversary, he seeks to recover monies for the trust, and thereby the unsecured creditors, based on alleged breaches of fiduciary duties committed by Defendants during the chapter 11 case. He claims that Defendants violated their loyalties to Debtors by helping the Schwabs negotiate deals for continuing ownership and/or management agreements with prospective purchasers. He argues that these activities took value away from the sale price of Debtors' assets, resulting in harm to the bankruptcy estate and unsecured creditors. He seeks disgorgement of fees paid to Defendants, damages and other relief.

Under the Creditor Trust Agreement, the Creditor Trustee's authority includes "analyzing, prosecuting and settling Avoidance Actions and Miscellaneous Causes of Action . . . and carrying out such other responsibilities not specifically set forth herein as may be vested in the Creditor Trustee pursuant to the Plan, this Creditor Trust Agreement, any Bankruptcy Court order or as may otherwise be necessary and proper to carry out the provisions of the Plan and the Confirmation Order." (Creditor Tr. Agreement, Art. 3.2, Main Case ECF No 694-3) Under the Plan, Miscellaneous Causes of Action are defined as "all Causes of Action other than Avoidance Actions." (First Am. Jt. Plan of Liquidation ¶ 1.48, Main Case ECF No. 694-1) In turn, "Causes of Action" are defined as "all claims and causes of action now owned or hereafter acquired by the Debtors, whether arising under any contract, the Bankruptcy Code, or other

---

[2] As of the confirmation date, the debtors became known as SII Liquidation Company. (Confirmation Order ¶ 26, Main Case ECF No. 698)

2

federal or state law, including, but not limited to, all litigation pending as of the Confirmation Date in any jurisdiction in which any of the Debtors are a plaintiff, defendant or other party, and all other adversary proceedings and lawsuits." (Id. at ¶ 1.17) "The order confirming the plan further gave the Creditor Trustee standing as a party in interest under § 1109(b) and stated

> [i]n addition to the foregoing, for all matters arising in, arising under or related to the Debtors or these Cases, the Creditor Trustee shall . . . . (vi) have exclusive standing (including derivative standing to pursue Causes of Action on behalf of the Debtors) to commence Avoidance Actions and Miscellaneous Causes of Action.

(Order Approving First Am. Jt. Plan of Liquidation ¶ 21, Main Case ECF No. 694)

At the onset of the case, Debtors filed an application to employ Parkland for restructuring services, with Goddard acting has Chief Restructuring Officer for Debtors. The court approved the application on March 25, 2010. The restructuring services were short-lived because Debtors ran out of cash and, in early April 2010, filed motions to establish bidding procedures and sell substantially all of their assets. A revised bidding procedures motion was presented in early May 2010 and approved by the court on May 14, 2010. In footnote five of the revised motion, Debtors disclosed that

> [V]arious of the potential purchasers, including Cement Resources [the stalking horse bidder], had discussions with the Schwab family regarding their going-forward role with the business operations of the Debtors . . . Cement Resources entered into discussions with certain members of the Schwab family and the Debtors' current management about the possibility of retaining some of (sic) all of them to serve as management for the businesses after the closing of the sale, in light of the history and experience of the current management team. Cement Resources has also had discussions with the Schwab family regarding the potential participation of a minority share of the equity of Cement Resources in exchange for certain consideration, including vehicles and other physical assets owned by the shareholders that are used in the Debtors' business operations. No final arrangement, however, has been reached . . . .

(M. for a Rev. Bidding Proc. Order p. 10, fn. 5, Main Case ECF No. 344)

The auction was conducted on May 27, 2010. At the end of the day, OldCastle Materials, Inc. ("OldCastle") and Resource Land Holdings, LLC ("RLH") were determined to be the successful bidders on a component basis. Cement Resources, the stalking horse bidder, had made a lower offer to buy Debtors' assets in their entirety. A highly contested sale hearing was held the following day which began on the understanding that the OldCastle/RLH bid was the

highest and best. During that hearing, however, Debtors' counsel advised the court that Debtors' Board (the Schwabs) had met and were deadlocked on which of the bids to accept: the OldCastle/RLH bid or the Cement Resources bid. At that point, the court specifically inquired about the "continuing involvement of any insider with respect to either the Oldcastle deal or the Cement Resources deal?" (Tr. From 5/28/10 hearing, 48:17-29, Main Case ECF No. 1118) Debtors' counsel advised the court that there had been discussions with both OldCastle and Cement Resources for some continued involvement by one or more of the Schwabs. (Id. at 48:21 – 49:2)

The court delved further into the issue and specifically questioned counsel for the unsecured creditors' committee ("Committee") whether there was any hint of bad faith that could affect the sale or sale process. Mr. Hammer, one of the attorneys for the Committee, specifically stated "[n]ot with respect to Oldcastle and [RLH]." (Id. at 53:4-5) He further stated

> We know that the Cement Resources transaction has an insider element to it. The extent of those insider elements have never been fully disclosed to us . . . still being worked out. But there is clearly a continuing role for management and insiders contemplated under the transaction . . . I don't believe that the Oldcastle/ Land Resource holding bid has – I don't believe they anticipate to retain management going forward . . . But you clearly have two different go-forward concepts here.

(Id. at 53:4 – 55:8)

Further questioning of OldCastle during the sale hearing revealed that

> And we saw in the Atlas[3] bid that they were negotiating to give employment agreements to management as well as an equity piece in the acquiring entity to Debtors' management. So we said okay. It looks like management is favoring that bid because they are doing that. We have no choice but to propose the same thing to management, at least, to equalize the playing field. So my client prepared some management agreement and a performance agreement and submitted it to the Schwabs … I don't believe they've responded to the agreement.

(Id. at 60:7-18)

Ultimately, the sale of Debtors' assets to OldCastle was approved and an order entered on May 28, 2010. The court contained findings that the sale was made in good faith and that the

---

3 The court is firmly convinced that "Atlas" is used by the purchaser to refer to the stalking horse bidder, Cement Resources but can offer no explanation.

4

purchase price was fair and reasonable.

The court approved Parkland fees totaling $730,040.00 and $10,454.23 in expenses. The first fee application was filed on July 22, 2010 and approved on August 10, 2010. The second and final fee application was filed on January 13, 2011 and approved on March 11, 2011. As set forth in these fee applications, Parkland provided services from February 26, 2010[4] to December 15, 2010.

Plaintiff filed the instant adversary complaint against Defendants on April 11, 2014. He alleges that Defendants worked on behalf of the Schwabs to the detriment of the estate in securing a nearly eight million dollar ($8,000,000.00) earn-out from OldCastle. The counts against Defendants include breach of fiduciary duties owed to the bankruptcy estates, aiding and abetting the Schwabs in the breach of their fiduciary duties, and disgorgement of fees. Plaintiff alleges that SS&G is the successor to Parkland, which SS&G denies.

# LAW

## I.  Jurisdiction

Plaintiff alleges that this court has jurisdiction under 28 U.S.C. § 1334 and this is a core proceeding under 28 U.S.C. § 157(b)(2)(F), (H) and (O). Defendants admit these allegations and state that "[t]o the extent permitted by and consistent with the United States Supreme Court's recent decision in *Executive Benefits Insurance Agency v. Arkinson*, 2014 WL 2560461, __U.S.__ (June 9, 2014), Defendants consent to the jurisdiction of this Court and to hear and make a final determination concerning the issues in this case." (Answer of Goddard and Parkland ¶ 12, Adv. ECF No. 20; Answer of SS&G ¶ 12, Adv. ECF No. 59) In spite of these admissions, a court has an obligation to review its exercise of subject matter jurisdiction. In re Brown, 2013 WL 1010359 (Bankr. S.D. Ohio 2013) (citing Rhiel v. Cent. Mortg. Co. (In re Kebe), 444 B.R. 871, 875 (Bankr. S.D. Ohio 2011)). Based on the following, the court is satisfied of its authority to decide this matter.

Under Stern, the statutory grant of authority in 28 U.S.C. § 157 may not be sufficient to confer jurisdiction on a bankruptcy court because certain claims exist that must be decided by Article III judges. Id. Such claims may include state law, private right claims that are not necessarily decided as part of the claims allowance process. Id. Although the bankruptcy court cannot issue a final decision on Stern claims, it can issue findings of fact and conclusions of law to submit to district court. Exec. Benefits Ins. Agency v. Arkinson, 134 S.Ct. 2165 (2014).

Plaintiff's claims relate to Defendants' services to the estate during the bankruptcy

---

4 Although the employment application filed on February 28, 2010 stated that all prepetition fees owed Parkland were paid, and Parkland was not a creditor of Debtors, the court is now aware that the first application included nominal amounts for prepetition services dated February 26, 2010 and February 27, 2010. The application also states that retainer funds remained as of the filing date which appear sufficient to cover the prepetition fees included in the fee application.

5

proceeding. Consequently, not only do they directly relate to matters that affected the administration of the estate, and resulted in payments from property of the estate, but they also are of the nature of claims that are naturally decided during the claims allowance process. Frazin v. Haynes & Boone, LLP (In re Frazin), 732 F.3d 313, 322 (5th Cir. 2013) ("[b]ecause the sole purpose of Frazin's breach of fiduciary duty action was to defeat the Attorneys' fee applications in bankruptcy court, the bankruptcy court necessary had to resolve every aspect of his breach of fiduciary duty claim to rule on the Attorneys' fee applications.") This close nexus to a matter directly and integrally connected to the bankruptcy case provides the foundation for the exercise of a court's jurisdiction. Albert v. Site Mgmt., 506 B.R. 453 (D. Md. 2014); Cantu v. Stone, 2014 WL 2949456 (S.D. Tex. 2014); In re McLelland, 460 B.R. 397 (Bankr. S.D.N.Y. 2011); Schultze v. Chandler, 765 F.3d 945 (9th Cir. 2014) (explaining why matter was core but not deciding whether court had authority to enter a final order) *cf.* Mickler v. Trujillo (In re Trujillo), 485 B.R. 797 (M.D. Fla. 2013). For this reason, no Stern violation arises and the court can hear and determine Plaintiff's claims.

    **II.    Plaintiff's standing**

Defendants' motion for judgment on the pleadings relies on Federal Rule of Civil Procedure 12(c), incorporated into bankruptcy practice through Federal Rule of Bankruptcy Procedure 7012. The court evaluates a motion for judgment on the pleadings in the same manner it would a motion to dismiss under Rule 12(b)(6). Daily Serv., LLC v. Valentino, 756 F.3d 893 (6th Cir. 2014) (citing Ziegler v. IBP Hog Mkt., Inc., 249 F.3d 509, 511-12 (6th Cir. 2001)). That means 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Daily Serv., 756 F.3d at 897 (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). The court views the facts in the light most favorable to the plaintiff and accepts them as true. Hayward v. Cleveland Clinic Found., 2014 WL 3558095, * 4 (6th Cir. 2014) (reporter citation not yet available) (citing Aho v. Cleveland-Cliffs, Inc., 219 Fed.App'x. 419, 422 (6th Cir. 2007) (other citation omitted)). Plaintiff fails only if there are absolutely no grounds upon which a claim can be founded. Id.

On two independent grounds, Defendants argue that Plaintiff lacks standing to assert his claims against them. First, Defendants avow Plaintiff cannot bring the action on behalf of Debtors' creditors. Second, they contend that the claims do not belong to the Trustee but were sold to OldCastle.

Standing is a tool used by courts to determine if a case or controversy exists in order to invoke federal jurisdiction under Article III of the Constitution. Cohn v. Brown, 161 Fed.App'x. 450, 454 (6th Cir. 2005) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)). Since standing is a basis for jurisdiction, it is a paramount inquiry. Cohn, 161 Fed.App'x. at 454 (citing Warth v. Seldin, 422 U.S. 490, 498 (1975); Coyne v. Am. Tobacco Co., 183 F.3d 488, 494 (6th Cir. 1999)). Plaintiff bears the burden of proof on his standing. Cohn, 161 Fed.App'x. at 454 (citing Lujan, 504 U.S. at 561).

In spite of its jurisdictional import, standing is rather amorphous, as recognized by

the Supreme Court. Whitmore v. Arkansas, 495 U.S. 149, 155 (1990) (noting 'the concept of "Art. III standing" has not been defined with complete consistency in all of the various cases decided by this Court which have discussed it.' Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc., 454 U.S. 464-471-76 (1982)). Under Supreme Court precedent, the foundation of standing is grounded in three elements: "proof of actual injury, causation and redressability." NicSand, Inc. v. 3M Co., 507 F.3d 442, 449 (6th Cir. 2007) (citing Lujan, 504 U.S. 555, 560-61). Under the first element, a plaintiff must establish a particularized injury to individual rights, "an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." United States v. Hays, 515 U.S. 737, 743 (1995).

Plaintiff claims that Defendants' actions resulted in a lower selling price or an earn-out payment to the Schwabs which should have been an asset of the Creditor Trust. Answering the question requires review of the nature of the claims asserted by Plaintiff, specifically who holds the right to bring a claim against professionals employed by Debtors during the chapter 11 proceedings.

In general, a bankruptcy estate consists only of property interests held by a debtor at the commencement of the case. 11 U.S.C. § 541(a). However, under § 541(a)(7), certain after acquired interests may also become property of the estate. Courts have determined that actions against professionals employed during the bankruptcy case are included in the estate under § 541(a)(7). In re Robotic Visions Sys., Inc., 343 B.R. 393 (Bankr. D.N.H. 2006) (citing Bezanson v. Thomas (In re R & R Assoc. of Hampton), 402 F.3d 257, 265 (1st Cir. 2005); Correll v. Equifax Check Serv., Inc., 234 B.R. 8, 11 (D. Conn. 1997)). It does not matter whether claims against professionals employed by the debtor during chapter 11 proceedings are property the estate because, even if they are not, Debtors transferred the assets to the Trustee under the Creditor Trust Agreement.

Through the first amended joint plan of reorganization, a Creditor Trust was established. (First Am. Jt. Plan ¶ 1.25, Main Case ECF No. 694-1) Debtors and their estates agreed to transfer all their interest(s) in Creditor Trust Assets, which included "proceeds from any Avoidance Actions or Miscellaneous Causes of Action engaged in by the Creditor Trust." (Creditor Trust Agreement ¶ 1.1.1, Main ECF No. 694-3) The latter actions were defined as "all Causes of Action other than Avoidance Actions." (First Am. Jt. Plan ¶ 1.48, Main Case ECF No. 694-1) In turn, a Cause of Action was defined as

> All claims and causes of action now owned or hereafter
> acquired by the Debtors, whether arising under any
> contract, the Bankruptcy Code, or other federal or state
> law, including, but not limited to, all litigation pending
> as of the Confirmation Date in any jurisdiction in which
> any of the Debtors are a plaintiff, defendant or other party,
> and all other adversary proceedings and lawsuits.

7

(Id. at ¶ 1.17)   If this was not clear enough, the confirmation order also specifically contained the following language concerning the nature of actions that were transferred to the Creditor Trust:

> As disclosed in the Disclosure Statement and as provided in the Plan, it is anticipated that a source of funds for payments to Creditor under the Plan will be recoveries from existing or potential Causes of Action commenced by or on behalf of the Debtors, their Estates and/or the Creditor Trust, which Causes of Action may include:   (i) any and all Causes of Action pursuant to any applicable section of the Bankruptcy Code, including Avoidance Actions . . . and (iii) claims against the Potential Insider Defendants based on:   (a) breaches of fiduciary duties (both prior to and after the Petition Date); (b) aiding and abetting breaches of fiduciary duties . . . The above list of potential claims . . . is not exhaustive, and if a specific Cause of Action or defendant is not identified thereon, it is because such Cause of Action or defendant is not known to the Debtors or the Creditor Trustee at this time.   On behalf of the Debtors and their Estates, the Debtors preserve for the Creditor Trust the rights to any Causes of Action that may be identified on or after the Confirmation Date.

(Order Conf. First Am. Jt. Plan ¶ I, Main Case ECF No. 694)   The confirmation order gave the Creditor Trust the right to prosecute the actions, declaring "the Creditor Trust shall retain and may exclusively enforce any Avoidance Actions, the Miscellaneous Causes of Action or other cause of action or rights to payment of claims that the Debtors or their estates may hold against any Person or entity."   (Id. at ¶ 28, Main Case ECF No. 694)   The sum of the above leaves the court with no doubt that the Creditor Trustee has standing to pursue the claims.

### A.  Defendants contend OldCastle purchased the claims

According to Defendants, Plaintiff cannot assert the claims against them because Debtors sold the claims to OldCastle.   They argue that the claims are part of the "Acquired Assets" were assets transferred to OldCastle under the asset purchase agreement ("APA").   The court rejects this contention.

Section 2.1 of the APA contains a definition, and a non-exclusive list, of the assets purchased by OldCastle.   Essentially, OldCastle purchased all assets except the Excluded Assets, which are defined in Section 2.3.   Defendants posit that since the claims are not excluded, they have to be deemed to be included.   This view is too simplistic.

Subparagraph (o) of Section 2.1 deals directly with "all Claims against third Persons . . . *with respect to the Business*."   (APA ¶ 2.1(o), Adv. Case ECF No. 24-1) (emphasis added)   As

set forth in Recital B of the APA, "Business" is the production, supply and distribution of ready-mix concrete and related products to entities in two states, plus operation of a deep-water port in Florida. The claims at issue in this proceeding are not Business claims and therefore were not transferred to OldCastle under this provision. This provision does, however, demonstrate that other third party non-Business claims exist. Defendants want the court to jump from the specific section addressing third party claims back to a general provision. This subverts one of the general rules of contract interpretation. *See* B.F. Goodrich Co. v. U.S. Filter Corp., 245 F.3d 587, 597 (6th Cir. 2001) (citations omitted). The court finds that the specificity of this section trumps the more general language in paragraph 2.1 relied on by Defendants. The section delineates between two types of third party claims: Business and non-Business. OldCastle acquired the former, not the latter. Debtors therefore retained their interests in these claims.

Further, APA excluded Avoidance Actions from the sale. Avoidance Actions were defined as "all rights and Claims of the Sellers for any action under the Bankruptcy Code, including avoidance actions available to them under Sections 544 through 551 of the Bankruptcy Code and actions under state law fraudulent transfer or fraudulent conveyance laws, or other similar laws, of whatever kind or nature." (APA, Art. 1, p. 2, Adv. Case ECF No 24-1) Irrefutably, recovery on claims of the estate clearly are actions under the Bankruptcy Code.

Finally, to the extent that any ambiguity exists, which the court does not find, Plaintiff submitted an affidavit from OldCastle disclaiming the purchase of the present claims. Consequently, any ambiguity which could be addressed by this statement would be resolved in favor of Plaintiff.

The court duly finds that the claims asserted by Plaintiff were not sold to OldCastle and were retained by Debtors. Debtors transferred their interests in the claims to the Creditor Trust. Consequently, Plaintiff, the Creditor Trustee, has standing to bring the claims.

### B. Directors and officers owe no duty to creditors

Defendants posit they owed no fiduciary duty to creditors under Ohio law. They frame this question as one of standing. However, the existence of a fiduciary relationship goes to the heart of a breach of fiduciary claim. In Ohio, a breach of fiduciary duty claim is predicated on three elements: '(1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately therefrom." Antioch Co. Litigation Tr. v. Morgan, 2013 WL 3976668, *2 (S.D. Ohio 2013) (slip copy) (citing Valente v. Univ. of Dayton, 438 Fed.App'x 381, 387 (6th Cir. 2011)).

The Ohio Supreme Court defines a fiduciary relationship as one 'in which special confidence and trust is reposed in the fidelity and integrity of another resulting in a position of superiority or influence, acquired by virtue of this special trust.' Capogreco v. Pro Ins. Agency, Inc., 2007 WL 4510266, * 11 (N.D. Ohio 2007) (citing Anchor v. O'Toole, 94 F.3d 1014, 1023 (6th Cir. 1996) (other citation omitted)). In Ohio, 'a fiduciary duty may arise through formal agreement or through an informal relationship, a de facto fiduciary relationship.' Antioch Co.

9

Litigation Tr., 2013 WL 3976673 at *9 (citing Capogreco, 2007 WL 4510266 at *11).

Relying on O.R.C. § 1701.59(E),[5] Defendants argue that they had no fiduciary duty to consider the interest of creditors under Ohio law. The cases they cite, however, miss the mark. All of the cases involve either non-bankruptcy or pre-bankruptcy activities of directors or officers on behalf of insolvent or nearly insolvent corporations. Defendants' relationship is readily distinguishable because it does not arise under general corporate law. Defendants were employed pursuant to § 327 of the Bankruptcy Code and, while Ohio law may not necessarily impose a duty on them, the Bankruptcy Code does.

A chapter 11 debtor-in-possession ("DIP") generally has the powers of a trustee. 11 U.S.C. § 1107(a). Unquestionably, a trustee is a fiduciary. Pollack v. FDIC (In re Monument Record Corp.), 71 B.R. 853, 862-63 (Bankr. M.D. Tenn. 1987) (citations omitted); Heavrin v. Schilling (In re Triple S Rest., Inc.), 342 B.R. 508, 512 (Bankr. W.D. Ky. 2006); Kirk v. Hendon (In re Heinsohn), 247 B.R. 237, 244 (E.D. Tenn. 2000). Therefore, a DIP is also a fiduciary. Sergent v. McKinstry, 472 B.R. 387, 409 (E.D. Ky. 2012). Since the DIP acts through individuals, "[n]aturally, these fiduciary duties fall upon the debtor's officers." Id. (citing Wolf v. Weinstein, 372 U.S. 633, 649-50 (1963)). One of the trustee/DIP's powers is the ability to hire professionals "that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title." 11 U.S.C. § 327(a). "The purpose of this statute is to ensure that all professionals appointed to represent the estate will tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities." In re Great Lakes Factors, Inc., 337 B.R. 657, 659 (Bankr. N.D. Ohio 2005) (citing Rome v. Braunstein, 19 F.3d 54, 58 (1st Circ. 1994)). These obligations create a fiduciary duty for the officers of a debtor-in-possession. Thus, when a DIP employs professionals, such as restructuring advisors, those professionals owe fiduciary duties to the estate.

### III. Res judicata

#### A. Fee applications

Defendants contend that the court's previous orders approving Defendants' fee applications bar the present claims. In order to apply res judicata, Defendants must demonstrate four elements: '(1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the same parties or their privies; (3) an issue in the subsequent action which was litigated or which should have been litigated in the prior action; and (4) an identity of the causes of action.' Rawe v. Liberty Mut. Fire Ins. Co., 462 F.3d 521, 528 (6th Cir. 2006) (citing Kane v. Magna Mixer Co., 71 F.3d 555, 560 (6th Cir. 1995)). Plaintiff challenges the existence of the first and third elements.

According to Plaintiff, the court could not issue a final determination on the merits because Defendants' involvement in the negotiations was not known until after the fee

---

5 O.R.C. § 1701.59(F) may be the intended reference.

applications were approved. This, however, does not alter the final nature of fee orders. Grausz v. Englander, 321 F.3d 467 (4th Cir. 2003). The first element is satisfied, as is the second element because the parties do not dispute that this action constitutes a subsequent action between the same parties or their privies. Defendants were the proponents of the previous fee application and are being sued here; Plaintiff now stands in the shoes of the Debtor.

The third element requires Defendants to show that the issue in this action, the alleged breach of duty by Defendants, should have been litigated at the time the fee applications were before the court. Since fee approvals are said to be an "implied finding of quality and value in [the professional's] services," Osherow v. Ernst & Young, LLP (In re Intelogic Trace, Inc.), 200 F.3d 382, 387 (5th Cir. 2000), the issues do intersect. Approval of a fee order determines that the services were reasonable and for the benefit of the estate. Allowing Plaintiff to bring breach of duty claims directly challenges this finding and also frustrates the purpose of res judicata, namely finality and an end to litigation.

Unlike many other cases, this is not a situation where Plaintiff was incapable of launching the claims during the earlier litigation. All of the events had occurred by the time the fee applications were filed, so the claims were ripe. Ohio v. City of Cleveland, 655 F.3d 516, 523 (6th Cir. 2011); Katt v. Dykhouse, 983 F.2d 690, 694 (6th Cir. 1994). Further, the court had jurisdiction. Merigian v. Heller Fin., Inc. (In re Sanders Confectionery Prod., Inc.), 973 F.2d 474, 482 (6th Cir. 1992). Plaintiff disagrees, arguing he could not bring claims based on facts he did not know. For this reason, he argues this case is distinguishable from a related adversary, Schwab v. Oscar (In re SII Liquidation Co.), 2012 WL 4327055 (Bankr. N.D. Ohio 2012), where the court determined that fee orders barred plaintiffs' pursuit of malpractice claims against bankruptcy counsel.

To determine whether an issue should have been litigated in an earlier lawsuit, the Sixth Circuit says that "[w]here the two causes of action arise from the 'same transaction, or series of transactions,' the plaintiff should have litigated both causes in the first action and may not litigate the second issue later." Holder v. City of Cleveland, 287 Fed.App'x 468, 471 (citing Rawe, 462 F.3d 521, 529). Clearly, both the fee applications and the present claims center on Defendants' provision of services to Debtor during the bankruptcy proceeding, thereby satisfying the "same transaction" requirement. However, rote application of this test doesn't account for Plaintiff's position that unknown or concealed facts hampered his ability to object to the fee applications and bring the claims then.

This concern is buttressed by the analysis used in other circuits. For example, in the Fifth Circuit, one item the court examines is "whether and to what extent [Plaintiff] had actual or implied awareness prior to the fee hearing of a real potential for claims against [the professionals] such as now alleged and of their likely consequences before the hearing." Intelogic Trace, Inc, 200 F.3d at 388. In Intelogic Trace, the court concluded that the Plaintiff had "sufficient general awareness of the real potential for claims against Ernst & Young . . . Although the Board may not have been aware of all the precise facts, the Board knew the numbers were flawed . . . ." and had questioned the value of the services based on the outcomes.

11

Id. at 389.

The Third Circuit employs a similar review: 'look at the date the final fee order was entered . . . and ask whether by that time [the plaintiff] knew or should have known there was a real likelihood that [he] had a malpractice claim.' Capital Hill Grp. v. Pillsbury, Winthrop, Shaw Pittman, LLC, 569 F.3d 485, 492 (citing Grausz, 321 F.3d 467, 474). If the facts show the plaintiff knew or should have known, the issue should have been litigated in the first suit. Consequently, what Plaintiff knew and when is material. This requires a detailed review of Plaintiff's history with this case.

On March 9, 2010, the United States Trustee filed notice of the appointment of the Committee. Three days later, attorneys Aaron L. Hammer, Richard S. Lauter and Thomas R. Fawkes, of Freeborn & Peters, LLP ("Freeborn & Peters") entered a notice of appearance on behalf of the Committee, followed by an application to employ the firm on March 14, 2010. The application was approved on April 19, 2010. On March 16, 2010, the Committee filed an application to employ Conway MacKenzie, Inc. ("CMI") as its financial advisor. This application was approved on April 19, 2010. As previously discussed, the plan provided for the creation of a liquidation trust and the appointment of a trustee. John B. Pidcock, the Plaintiff, was designated as the trustee on December 6, 2010. (Ntc. of Designation of Creditor Trustee, ECF No. 690). Mr. Pidcock is employed with CMI. On December 15, 2010, following confirmation, Freeborn & Peters entered appearances on behalf of Mr. Pidcock.

The Committee and CMI were actively involved in the case, from pre-sale through confirmation of the plan of liquidation. CMI's interim application for fees, filed on July 2, 2010, shows that Mr. Pidcock was a managing director and billed 345.4 hours for the period from March 12, 2010 through May 31, 2010. (Interim Fee App. ¶ 25, ECF No. 519) This represents one-third of CMI's total billed time for this period. In the final fee application, he personally billed 495.6 hours of services for the period from March 12, 2010 through December 31, 2010, nearly forty percent of the total time billed. (Final Fee App. ¶ 36, ECF No. 755)

The above is relevant to establish that Mr. Pidcock, through his affiliation with CMI, was actively and substantially involved in the case prior to his appointment as Creditor Trustee. Further, he was then, and is now, also represented by the same law firm. This level of involvement and participation renders him unable to disclaim events or knowledge of events that occurred during the case.

At a minimum, Mr. Pidcock should have had knowledge that the Schwabs were negotiating not only with both the stalking horse bidder, Cement Resources, but also with the ultimate purchaser, OldCastle, and other bidders. The revised bidding procedures alluded to the negotiations and the negotiations were discussed during the sale hearing. Further, counsel for the Committee was directly questioned about the negotiations during the sale hearing. All of this was done before Parkland filed fee applications.

What gives the court pause is the fact that at no time before the fee applications were

12

Defendants linked to these negotiations. Thus, Mr. Pidcock may have been aware of the Schwabs' efforts but unaware of any participation by Defendants. And, as he aptly points out, any work negotiating on behalf of the Schwabs is not disclosed in the fee applications. Since Plaintiff was not aware of the activity, he maintains that his present claims could not have been litigated at the time the fee applications were decided. And a 'general awareness of the background facts,' is insufficient to give notice of potential claims. Penthouse Media Grp., Inc. v. Pachulski Stang Ziehl & Jones LLP, 406 B.R. 453, 462-63 (S.D.N.Y. 2009).

In Penthouse Media, although the malpractice occurred before the fee applications were decided, the affected party only had notice of the malpractice after the fees were approved. The record in this case reveals a similar scenario. There are no facts that suggest, at the time of the fee applications, Plaintiff had reason to suspect this problem. However, Plaintiff's difficulty is that in this circuit, he must demonstrate affirmative concealment, not mere silence or inaction, to avoid the application of res judicata. Browning v. Levy, 283 F.3d 761, 770 (citing McCarty v. First of Georgia Ins. Co., 713 F.2d 609 (10th Cir. 1983)). Defendants' failure to disclose the activities in the fee applications, if true, constitutes affirmative concealment. As a result, the court finds that the third element has not been established and Defendants are unable to avail themselves of the defense of res judicata based upon the fee applications.

### B. Sale order

Defendants' urge the court to adopt a position that, because Plaintiff's claims necessarily impugn the good faith finding of the sale, they are barred by res judicata. The court will not restate the four elements of res judicata. It does note, however, that "[b]ecause a bankruptcy case is fundamentally different from the typical civil action, comparison of a bankruptcy proceeding with another proceeding is not susceptible to the standard *res judicata* analysis. Rather, the court must scrutinize the totality of the circumstances in each action and then determine whether there is identity of the causes of action." HSBC Bank USA, N.A. v. Adelphia Commc'ns Corp., 2009 WL 385474, * 12 (W.D.N.Y. 2009) (citing Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 419 n. 5 (3rd Cir. 1988)).

#### 1. Finality

The Sixth Circuit determined that a sale order is a final order for res judicata purposes, so the first element is satisfied. Winget v. JP Morgan Chase Bank, N.A., 537 F.3d 565, 578 (6th Cir. 2008).

#### 2. Parties or privies

Defendants declare that the second element is also satisfied because "Defendants and the Debtors are the same parties involved with the Sale Order, and Plaintiff, by stepping into the Debtors' shoes, is in privity with the Debtors as discussed [in the fee application section]." (M. for Judg. on the Pleadings, p. 19, ECF No. 24) Plaintiff did not counter, instead choosing to focus on other elements of res judicata. The court is not inclined to summarily dispense with a

review of this element.

  The court cannot agree that Defendants were parties to the sale order. The sale order approved a sale between Debtors and the purchasers, OldCastle and LRH. It was approved and accepted by other parties, including KeyBank, N.A., as agent for the secured creditors, the Committee, and Naples Lending Group. Unlike the fee application, Defendants were not parties to the sale order, contrary to what is stated in their motion. And, unlike the fee application, they had no direct interest in the sale order. Although the Sixth Circuit had advanced a broad definition of "party" to include creditors and equity security holders, Defendants were neither. Sanders Confectionery Prods., Inc. v. Heller Fin., Inc., 973 F.2d 474, 481 (6th Cir. 1992). Any interest which may have existed arises vis a vis Defendants' relationship to Debtors, making this, at best, a question of privity.

  Privity creates an exception to the general rule that a person cannot be personally bound by a judgment when he was not a party or served with process. Richards v. Jefferson Cty., Alabama, 517 U.S. 793, 799 (1996) (citing Hansberry v. Lee, 311 U.S. 32, 40 (1940)). Through privity, a nonparty may be bound by a prior judgment because "his interests [were] adequately represented by someone with the same interests who is a party." Id. It is possible for privity to exist between an employer and employee. *See* Davis v. Davis, 551 Fed.App'x 991 (11th Cir. 2014) (finding privity when employer is vicariously liable for employee's acts); Harrison v. Deere & Co., 533 Fed.App'x 644 (7th Cir. 2013) (indicating employees can be in privity with their employers when interests are aligned as in an agency relationship); LaMie v. Wright, 2014 WL 3341587 (W.D. Mich. 2014) (slip copy) (citing Sixth Circuit cases along the same lines). However, privity does not exist in all employee-employer or agency relationships. Summers v. Penn Cent. Transp. Co., 518 F.Supp. 864 (S.D. Ohio 1981); Bennett v. Zurich Am. Ins. Co., 2013 WL 3048493 (S.D. Ga. 2013). Moreover, officers and directors generally are deemed privies only when acting in an official capacity, otherwise a corporation is a separate and distinct entity. Dorchen/Martin Assoc., Inc. v. The Brook of Boyne City, Inc., 2013 WL 2418175, * 7-8 (E.D. Mich. 2013) (unpublished) (citations omitted). Plaintiff's allegations destroy these traditional relationship paradigms between Debtors and Defendants because he alleges Defendants acted outside the scope of their employment and in derogation of their fiduciary duties to Debtors, constituting a challenge to privity.

  In the Sixth Circuit, a privy is defined as "a successor in interest to the party, one who controlled the earlier action, or one whose interests were adequately represented." Id. Defendants aptly point out that it is the Plaintiff who is Debtors' successor in interest. Privity based on control means the nonparty has an "effective choice as to the legal theories and proofs to be advanced in behalf of the party to the action [and also] over the opportunity to obtain review." Becherer v. Merrill Lynch, Pierce, Fenner, and Smith, Inc., 193 F.3d 415, 423 (6th Cir. 1999) (internal quotations marks omitted) (quoting Benson and Ford, Inc. v. Wanda Petroleum Co., 833 F.2d 1172, 1174 (5th Cir. 1987) (citation omitted)). This has not been alleged. Consequently, Defendants are in privity with Debtors only to the extent their interests were adequately represented in the sale process. Also known as virtual representation, it requires """an express or implied *legal* relationship in which parties to the first suit are *accountable* to

14

non-parties who file a subsequent action raising identical issues . . . or an express agreement to be bound by or acquiescence to a party's representation.'"" Becherer at 423 (emphasis added) (citing Benson and Ford, Inc., 833 F.2d at 1175; Restatement (Second) of Judgments § 40 (1980); Bittinger v. Tecumseh Prods. Co., 123 F.3d 877, 880 (6th Cir. 1997)). This alliance of interest does not exist between Debtors and Defendants to create privity on these facts. Defendants simply did not have a stake in the sale order to raise them to the status of true parties to the sale order with a legal interest. See Corzin v. Fordu (In re Fordu), 201 F.3d 693, 705 (6th Cir. 1998). Defendants have failed to establish the second element necessary to preclude Plaintiffs' claims under the doctrine of res judicata.

### 3. Actual or obligatory litigation

Further, Defendants have also failed to establish the third element, that the present issue was, or should have been, litigated during the sale process. "Where the two causes of action arise from the 'same transaction, or series of transactions,' a plaintiff should have litigated both causes in the first action and may not litigate the second issue later." Holder, 287 Fed.App'x 468, 471 (citing Rawe, 462 F.3d 521, 529). Defendants contend that since Plaintiff's claims seek to impugn the sale, they are an impermissible collateral attack on the sale order and that they are protected by the court's good faith finding in the sale order. The court disagrees. Although Plaintiff's claims may relate to the sale order, they are transactionally distinct.

Sale orders enjoy nearly inviolate status in bankruptcy court. Several policies undergird this wardship, including a desire to encourage, rather than chill, bidding and maximize the value obtained by sale. In re Frankel, 191 B.R. 564, 572 (Bankr. S.D.N.Y. 1995) (citing In re Webcore, Inc., 392 F.2d 893, 899 (7th Cir. 1968)). Plus unwinding a sale can be extremely difficult. Consequently, sale orders enjoy special protection under 11 U.S.C. § 363(m):

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

If a party fails to appeal a sale order, most courts find that the only other avenue for relief is Federal Rule of Civil Procedure 60(b). Canzano v. Ragosa (In re Colarusso), 382 F.3d 51 (1st Cir. 2004); Matter of Edwards, 962 F.2d 641 (7th Cir. 1992); In re Cambridge Factors, Inc., 1995 WL 146212 (S.D.N.Y. 1995) (unpublished); In re Rome Family Corp., 2010 WL 1381093 (Bankr. D.Vt. 2010). But even under Rule 60(b), courts consider the same policies underlying § 363(m). Colarusso, 382 F.3d at 62; Schneider v. Hoyer (In re Alan Gable Oil Dev. Co.), 978 F.2d 1254, 1992 WL 329419, *4 (4th Cir. 1992) (unpublished); In re Summit Ventures, Inc., 161 B.R. 9 (D. Vt. 1993).

15

Clearly, the present situation does not involve an appeal, nor is it a Rule 60(b) challenge. However, a review of § 363(m) and its policies is instructive because the good faith finding in the sale order is directly linked to this provision. Consequently, understanding the underpinnings of good faith and finality in the context of the validity of the sale is helpful.

In discussing § 363(m), the Sixth Circuit explained

> Section 363(m) protects the reasonable expectations of good faith third-party purchasers by preventing the overturning of a completed sale, absent a stay, and it safeguards the finality of the bankruptcy sale. *Official Comm. of Unsecured Creditors v. Trism, Inc. (In re Trism, Inc.)*, 328 F.3d 1003, 1006 (8th Cir. 2003). As a result, "[s]ection 363(m) maximizes the purchase price of assets because without this assurance of finality, purchasers could demand a large discount for investing in a property that is laden with the risk of endless litigation as to who has rights to estate property. *In re Gucci*, 126 F.3d 380, 387 (2nd Cir. 1997).

<u>Made In Detroit, Inc. v. Official Comm. of Unsecured Creditors of Made in Detroit, Inc. (In re Made In Detroit, Inc.)</u>, 414 F.3d 576, 581 (6th Cir. 2005).

Many courts interpret § 363 as a per se rule against an appeal unless a stay of the sale order is obtained. *See generally* <u>Parker v. Goodman (In re Parker)</u>, 499 F.3d 616, 620-21 (6th Cir. 2007) (citations omitted) (discussing the majority and minority positions without adopting either). The Third Circuit does not use the per se rule, instead electing a two part inquiry to determine whether an appeal of a sale order is moot. Under this test, the court deems the appeal moot only "if the party failed to obtain a stay *and* reviewing courts cannot grant effective relief without impacting the validity of the sale." <u>Parker</u> at 621 (citing <u>Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.</u>, 141 F.3d 490, 499 (3d Cir. 1998) (other citations omitted) (emphasis original)). Section 363(m) limits appellate review of a sale order.

Several items are notable from a review of § 363(m) and related case law. First, protection of the sale is paramount. As long as the purchase was made in good faith, the only way to disturb the validity of the sale is to obtain a stay pending appeal. Otherwise, the sale order will stand. "This 'statutory mootness' provision not only protects the buyer, but also increases the ability of the bankruptcy estate to get a good price." <u>The Official Comm. of Unsecured Creditors v. Anderson Senior Living Prop., LLC</u>, 620 F.3d 584, 586 (6th Cir. 2010). As the esteemed Judge Posner explained

> A sale under 363(b) that fails to comply with the notice or hearing requirements of the statute and the applicable bankruptcy rules is

16

> invalid and may be set aside on appeal. But it is not void. This is
> shown by the fact that even a reversal on appeal of the order
> authorizing or confirming the sale will not affect the sale's validity
> if the buyer was acting in good faith and the sale had not been
> stayed pending appeal.

Gekas v. Pipin (In re Met-L-Wood Corp), 861 F.2d 1012, 1018 (7th Cir. 1988). Even if problems with the sale procedure are identified, the validity of the sale survives.

In Met-L-Wood, an oft-cited § 363(m) case, the debtor was facing foreclosure. For unexplained reasons, the debtor filed chapter 11 and immediately sought authorization to proceed with the scheduled foreclosure sale, which the court approved. The assets were sold and the case later converted to chapter 7. The chapter 7 trustee filed a lawsuit alleging fraud in the sale and RICO violations. Although he didn't specifically seek to overturn the sale, the court found that "by seeking heavy damages from the seller, the purchaser, the purchaser's purchaser (Pipin), a law firm involved in the transaction, and the secured creditors that benefitted from the sale, the suit is a thinly disguised collateral attack on the judgment confirming the sale." Id. Even though the trustee was willing to let the sale stand, the court spurned the attempt due to the breadth of the relief sought against integral parties tied to the sale transaction. The same facts do not exist in this proceeding. The validity of the sale is unchallenged, nor are damages being sought from the broad array including purchasers and creditors.

Second, case law shows that § 363(m) protects the purchaser by allowing it to receive the benefit of its bargain and move forward in reliance on the sale order. In discussing policy, the Sixth Circuit recognized that § 363(m) "is predicated on the particular need to encourage participation in bankruptcy asset sales and increase the value of property of the estate by protecting good faith purchasers from modification by an appeals court of the bargain struck with the debtor.' Nashville Senior Living, 620 F.3d 584, 591 (citing Weingarten Nostat, Inc. v. Serv. Merch. Co., 396 F.3d 737, 741 (6th Cir. 2005)). Good faith purchasers also receive special protections under 11 U.S.C. § 549(c), so this concept is not novel. To this end, the Met-L-Wood court took a purchaser's protection a step further to extend it to situations where res judicata would not apply:

> A proceeding under section 363 is an *in rem* proceeding. It trans-
> fers property rights, and property rights are rights good against the
> world, not just against parties to a judgment or persons with notice
> of the proceeding.

Met-L-Wood, 861 F.2d 1012, 1017. Attempting to upset the protection offered good faith purchasers is disfavored by courts.

Although the Bankruptcy Code does not define good faith, most courts, including the Sixth Circuit, employ a traditional definition focused on the purchaser's actions. Made In Detroit., 414 F.3d 576, 581 ('one who purchases assets for value, in good faith, and without

17

notice of adverse claims' (citation omitted) *accord* Tompkins v. Frey (In re Bel Air Assoc., Ltd.), 706 F.2d 301, 305 (10th Cir. 1983) (buying in good faith for value); Greylock Glen Corp. v. Comm. Sav. Bank, 656 F.2d 1 (1st Cir. 1981) ("one who purchases assets for value, in good faith, and without knowledge of adverse claims"); In re TMT Procurement Corp., 2014 WL 4364894 (5th Cir. 2014) (same). A lack of good faith is demonstrated by 'fraud or collusion between the purchaser and the seller or the other bidders, or that the purchaser's actions constituted an attempt to take grossly unfair advantage of other bidders.' Made In Detroit, 414 F.3d at 581 (citing In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)). "The good-faith requirement 'speaks to the integrity of [the purchaser's] conduct in the course of the sale proceedings.'" Id.

The court outlines the above to emphasize two points concerning the protections of § 363(m): (1) good faith findings are mainly intended to uphold a transaction involving an innocent purchaser, and (2) finality protects only the validity of the sale. With regard to the former, the court declines to view a "good faith" finding in a sale order more expansively than necessary. Instead, the court reads it as a prophylactic for a good faith purchaser. Concerning the latter, the court notes that actions that do not affect the validity of the sale was an avenue directly left ajar by the Sixth Circuit in Parker. 499 F.3d 616, 620-21. Consequently, the court concludes that the "good faith" finding does not extend as far as Defendants advocate.

The court did find the sale was made in good faith after specific litigation on this point. During the sale hearing, the court specifically inquired of Committee counsel, who now represents Plaintiff, about whether the Schwabs' negotiations related to the side deals tainted the sale process. Counsel denied any concerns related to OldCastle. The court subsequently signed an order finding the sale was conducted in good faith between Debtors and the purchasers of Debtors' assets *as it relates to § 363(m) and attempts to invalidate the sale*. (Order Authorizing Sale ¶ 18, Main Case ECF No. 455 (emphasis added)) This finding was directed to and for the benefit of the purchasers. The process of selling the assets was not a transaction, or series of transactions, designed to legitimize all actions of professionals in the case. Plaintiff's claims, including breach of fiduciary duty, involve transactions between Defendants and Debtors/the estate. The sale order focused on the estate's disposition of assets. As a result, the court cannot conclude that Plaintiff's claims arise from the same transaction/series of transactions and therefore meet the "were/should have been litigated" requirement. The third element necessary for application of res judicata fails.

Having found two of the elements are lacking, the court will not explore the fourth element. The sale order does not preclude litigation of Plaintiff's claims.

### IV. Plan exculpation clause

Defendants maintain that the exculpation clause in the plan forecloses Plaintiff's claims. Plaintiff argues that only certain claims are excluded, not those he brings.

The plan exculpation clause leaves the door open to claims involving "fraud, willful

misconduct, or gross negligence." (Am. Plan ¶ 7.18, Main Case ECF No. 655) Plaintiff's complaint contains three counts: one for breach of fiduciary duty, one for aiding and abetting the Schwabs, and one for disgorgement of fees. As part of these counts, Plaintiff has alleged that Defendants engaged in a gross conflict of interest, fraud upon the court, and willfully and wrongly acted to further the Schwabs' misconduct. (Complaint ¶¶ 100, 106, 08, 109, 110, Adv. Case ECF No. 1) While these are not necessarily elements of the causes of action advanced by Plaintiff, the allegations, if accepted as true, could result in findings that remove these claims from the protection offered under the exculpation clause. Therefore, the court cannot find that the exculpation clause eliminates further action on the complaint.

## V. Aiding and abetting cause of action

According to Defendants, Ohio does not recognize an aiding and abetting claim. Plaintiff failed to counter this argument, which the court will signify as a concession. Concerning "tortious acts in concert, the Sixth Circuit recognized that "it is highly doubtful that Ohio even recognizes such a tort." Estate of Barney v. PNC Bank, N.A., 714 F.3d 920, 929 (6th Cir. 2013) (citing DeVries Dairy, LLC v. White Eagle Coop. Ass'n, Inc., 132 Ohio St.3d 516 (2012)). Consequently, the court finds that count two of the complaint must be dismissed.

## **CONCLUSION**

Defendants were professionals employed by the debtor-in-possession under the bankruptcy code. This relationship confers fiduciary obligations on Defendants. Consequently, as the successor to Debtors, and as the Creditor Trustee of the trust established for the benefit of the unsecured creditors, Plaintiff has standing to bring claims against Defendants. The claims were not sold to OldCastle but were retained by Debtors and transferred to the Creditor Trust through Debtors' confirmed liquidation plan.

Plaintiff's contention that Defendants breached their fiduciary duties is not barred by application of res judicata based on the court-approved fee applications for Defendants. While the record shows that Plaintiff was on notice about the Schwabs' involvement in negotiating with potential purchasers, taken in the light most favorable to Plaintiff, the court can find nothing that demonstrates Plaintiff either knew, or should have known, about Defendants' involvement in the negotiations. Consequently, he could not have brought a claim against Defendants when the fee applications were decided.

Similarly, the sale order does not bar the claims. The good faith finding in the sale order focused on the integrity of the purchaser with the purpose of upholding the sale in the face of an appeal. Extending its import beyond these parameters to condone all actions of participants in the process oversteps its reach. Defendants cannot use the finding as an umbrella of protection for their actions. Further, the "claim" litigated through the sale process and the present claims against Defendants arise from separate transactions.

The exculpation bars only certain claims. Although Plaintiff's causes of action do not

19

14-06016-rk    Doc 67    FILED 10/17/14    ENTERED 10/20/14 08:39:05    Page 19 of 20

directly contain elements that correspond to the claims referenced in the exculpation clause, this does not preclude findings that may fall within the parameters of claims that are not exculpated. The allegations in the complaint, when taken in the light most favorable to Plaintiff, suggest Defendants acted in a way which may subject them to liability.

Finally, count two of the complaint will be dismissed. There is no indication that Ohio allows a tort for aiding and abetting. Plaintiff also appears to have abandoned any effort to save this claim.

The court will issue an order simultaneously with this opinion.

# # #

**Service List:**

Thomas R. Fawkes
Steven M. Hartmann
Shira Isenberg
Richard S. Lauter
Freeborn & Peters LLP
311 S. Wacker Drive
Suite 3000
Chicago, IL 60606

Todd A. Atkinson
Richard G. Hardy
Ulmer & Berne LLP
1660 West 2nd Street
Suite 1100
Cleveland, OH 44113-1448

Rachel L. Steinlage
Peter Turner
28601 Chagrin Blvd.
Suite 500
Cleveland, OH 44122